* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments before the Full Commission. The appealing parties have shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. This case is subject to the North Carolina Workers' Compensation Act, and the parties are bound by and subject to the North Carolina Worker's Compensation Act.
4. An employment relationship existed between plaintiff and defendant on August 4, 2003.
5. Defendant was a duly qualified self-insurer at the time of the injury by accident on August 4, 2003, and Key Risk Management Services, Inc. was its servicing agent.
6. Plaintiff's average weekly wage was $484.02, yielding a compensation rate of $322.70 per week.
7. Plaintiff sustained an injury by accident arising out of and in the course of her employment on August 4, 2003. Plaintiff's disability began on November 21, 2003. Defendant accepted the compensability of the injury by accident by filing a Form 60 on January 22, 2004, in which the description of the injury is "EE fell on right knee and shoulder." Plaintiff is receiving ongoing temporary total disability compensation. Defendant denies plaintiff's contention that her left leg and left knee complaints are causally related to her right knee injury on August 4, 2003, and defendant filed a Form 61 on January 24, 2005, denying this portion of the claim.
8. The following documents were stipulated into evidence at the Deputy Commissioner's hearing: *Page 3 
 a. Stipulated Exhibit 1: Pre-Trial Agreement.
 b. Stipulated Exhibit 2: Industrial Commission Forms.
 c. Stipulated Exhibit 3: Plaintiff's medical records, indexed and paginated 1-388.
 d. Stipulated Exhibit 4: Additional medical records, indexed and paginated 1-9.
 e. Murphy Deposition Exhibit 1: Additional medical records consisting of 3 pages.
9. The issues before the Full Commission are whether plaintiff's left leg, left knee and right knee conditions are causally related to the original, compensable injury by accident on August 4, 2003; and, if so, what additional benefits plaintiff is entitled to receive.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on December 20, 1950 and was 54 years of age as of the date of the Deputy Commissioner's hearing. Plaintiff graduated from high school and attended Wayne Community College, where she received certificates in Health Unit Clerk Coordinator (or unit secretary), sales, and child development.
2. Plaintiff's prior work experience includes teaching physical education on a volunteer basis in local schools, retail sales work at Kerr Drugs, clerical work for a construction company, and short order cook and cashier at a restaurant. *Page 4 
3. Prior to working for defendant, plaintiff worked for over 15 years at Wayne Memorial Hospital in Goldsboro, North Carolina. Her jobs included instrument tech and inventory clerk for the operating room. The latter position included dealing with sales representatives, ordering packs of instruments to be used in surgical cases, and instructing other employees how to assemble surgical instruments in central sterile supply. The inventory clerk position did not involve much lifting, and it allowed plaintiff to alternate sitting and standing. Plaintiff also worked for approximately three years as a cashier in the Wayne Memorial Hospital cafeteria, which allowed her to alternate sitting and standing.
4. Plaintiff began working for defendant as an operating room technician on or about February 12, 2001 and last worked there on January 6, 2004. Plaintiff's job duties including assembling sterile instruments for surgical care and working as a preceptor for registered nurses who were coming into the operating room to learn how to do surgery. Plaintiff's job as an operating room processing technician involved standing and lifting.
5. On July 31, 2002, Dr. Daniel Murphy of Murphy/Wainer Orthopedic Specialists in Greensboro first evaluated plaintiff for complaints of knee pain, as well as popping, swelling, and occasionally feeling as if the right knee was giving way. Plaintiff was taking Motrin and Aleve, and the pain occasionally awakened her at night. Plaintiff also reported prior right knee pain approximately eight years earlier, for which she had received an injection that resulted in significant relief. X-rays of the right knee showed mild to moderate degenerative joint disease medial joint line with a small amount of spurring present. Dr. Murphy treated plaintiff with cortisone injections on July 31, 2002 and March 4, 2003.
6. Plaintiff saw Dr. Murphy on March 4, 2003 for re-evaluation of both knees. Plaintiff's symptoms in her left knee were worse than in the right knee. Approximately two *Page 5 
weeks prior, plaintiff had been to a local hospital emergency room and received Vicodin, a narcotic pain medication, and Ibuprofen, an anti-inflammatory pain medicine, for her knee complaints. Plaintiff complained to Dr. Murphy of some mechanical pain and popping, and significant aching in the left knee all the time.
7. Dr. Murphy's physical examination revealed reduced range of motion in both knees, patellofemoral crepitance, Baker's cysts, and medial joint line tenderness bilaterally, all consistent with degenerative arthritis. Standing x-rays of plaintiff's knees showed marked joint space narrowing, right greater than left medially. The comparison of plaintiff's x-rays from March 4, 2003 with the x-rays of July 31, 2002 demonstrated a progression or worsening of the degenerative arthritis in both knees.
8. On August 4, 2003 while at work, plaintiff came out of the operating room and walked through the nurses' lounge when she tripped on some boxes and fell, landing on her right knee, shoulder, and wrist. Two employees helped plaintiff up, and she went to defendant's employee health department, where she received Ibuprofen for pain.
9. On August 12, 2003, plaintiff was evaluated by Dr. Kurt Lauenstein at Workers' Comp Solutions, part of the Moses Cone Health System. She complained of pain in her right wrist, shoulder, and knee. Plaintiff told Dr. Lauenstein that she had previously seen Dr. Murphy for "torn cartilage" in her right knee, for which she had received a cortisone injection. Dr. Lauenstein noted tenderness in the right knee and wrist. He prescribed Vioxx, a wrist splint, and placed plaintiff on light-duty work.
10. Plaintiff returned to Dr. Lauenstein on August 19 and August 26, 2003, with increased swelling in her right knee and pain in her right knee and right wrist. Dr. Lauenstein recommended physical therapy, which she began on September 10, 2003 for her right leg. *Page 6 
11. Although she improved in range of motion and strength, plaintiff continued to experience pain and unsteadiness in her right knee. On September 2, 2003, plaintiff was evaluated by Dr. Mary Ruth Hunt at Workers' Comp Solutions. Dr. Hunt recommended sedentary work and an orthopedic referral.
12. On October 21, 2003, plaintiff was examined again by Dr. Murphy, who noted that he treated plaintiff in the past for advancing medial compartment degenerative arthritis in both knees. Plaintiff reported that she had hurt her knee on the right side on August 5, 2003. Following an examination, Dr. Murphy's impression was an exacerbation and worsening of her prior degenerative joint disease of her right knee, as well as chondromalacia patella right knee, and right knee possible medical meniscus tear. Dr. Murphy wrote plaintiff out of work for 48 hours and recommended an MRI. Dr. Murphy injected the right knee with cortisone and Marcaine and recommended a one-month follow-up, with consideration of right knee arthroscopy if plaintiff was not improved at that time.
13. An MRI was performed on November 6, 2003, which showed degenerative arthritis with a large joint effusion with synovitis and accelerated medial compartment degenerative change with a tear within the medial meniscus extending in the inferior surface, and a suspected occult bucket handle tear. After reviewing the MRI findings, Dr. Murphy recommended arthroscopic surgery. Plaintiff was written completely out of work beginning on January 6, 2004.
14. On January 15, 2004, Dr. Murphy performed surgery on plaintiff's right knee, including a partial meniscectomy with debridement medical compartment, chondroplasty patellofemoral joint, and partial synovectomy. The arthroscopy revealed more extensive damage than expected and Dr. Murphy's post-operative diagnoses were extensive complex irreparable *Page 7 
tearing medial meniscus, Grade II to III chondromalacia patellofemoral joint mostly in the trochlea, Grade III and IV chondral changes medial compartment some areas bone on bone, and mild Grade II chondromalacia lateral tibial plateau. Dr. Murphy was disappointed to discover the extensive bone-on-bone degenerative arthritis in the medial compartment of plaintiff's right knee, because her x-rays had still suggested plaintiff had more cartilage left on the inner side than was found during surgery.
15. Following surgery, plaintiff was referred to physical therapy. Upon her return visit to Dr. Murphy on March 3, 2004, he indicated that plaintiff would likely need some type of knee replacement surgery, and recommended the possibility of a unicompartment replacement to replace the medial compartment of plaintiff's right knee.
16. On April 12, 2004, Dr. Murphy performed a right medial unicompartmental knee replacement. Dr. Murphy's post-operative diagnosis was end stage degenerative arthritis medial compartment right knee, with Grade II changes in the femoral trochlea.
17. Plaintiff followed up with additional physical therapy for her right knee. During physical therapy, plaintiff met all goals with respect to her right knee, although the therapist noted that plaintiff was limited in her therapy due to complaints of left knee pain.
18. On July 13, 2004, Dr. Murphy noted that plaintiff was doing well with respect to her right medial unicompartmental knee replacement, with minimal symptoms on the right, but that her left knee was more symptomatic. X-rays revealed good seating and alignment of the prosthesis on the right, but on the left, plaintiff had almost bone-on-bone arthritis in the medial compartment. Dr. Murphy's impression was that plaintiff's left knee had degenerative arthritis that was becoming symptomatic. Dr. Murphy injected the left knee with cortisone. *Page 8 
19. Plaintiff was discharged from physical therapy on July 21, 2004, at which time the therapist noted that plaintiff's right knee was functional with full range of motion and good strength, but that she had not returned to work secondary to complaints of left knee pain.
20. On August 24, 2004, plaintiff returned to Dr. Murphy, complaining of some increased swelling in the right knee with pain in the medial aspect. Dr. Murphy prescribed Celebrex and Percocet.
21. At her October 12, 2004 visit, Dr. Murphy noted that plaintiff continued to improve with respect to her right knee, but that the significant arthritis in her left knee was causing increasing symptoms. Dr. Murphy noted that plaintiff's symptoms in the left knee were all degenerative in nature. He recommended continuing rehabilitation for her right knee, and anticipated releasing plaintiff at maximum medical improvement in January 2005. Dr. Murphy also noted that plaintiff's increasingly symptomatic left knee was interfering with rehabilitation for the right knee. He recommended another left knee injection in one week and discussed possible left knee replacement in the future. Plaintiff returned on October 19, 2004, when Dr. Murphy injected her left knee with cortisone.
22. On November 23, 2004, Dr. Murphy noted that plaintiff continued to struggle with rehabilitating her right knee. As plaintiff's left knee symptoms increased, it placed more stress on the right knee and inhibited improvement on the right. He recommended an MRI scan of the left knee and tentatively discussed proceeding with unicompartmental replacement on the left.
23. An MRI scan of plaintiff's left knee on December 3, 2004 revealed tricompartmental degenerative changes, most significantly involving the medial compartment where there were areas of full thickness cartilage loss, joint space narrowing, and osteophytic *Page 9 
spurring, as well as a degenerated and torn medial meniscus and a small joint effusion. After reviewing these results, on December 20, 2004, Dr. Murphy discussed treatment options with plaintiff and recommended a left medial unicompartmental knee replacement.
24. On January 17, 2005, Dr. Murphy performed the left medial unicompartmental knee replacement surgery on plaintiff's left knee. Dr. Murphy's post-operative diagnoses were end stage degenerative arthritis medial compartment left knee with Grade IV changes and complex tearing meniscus, as well as chondromalacia patella and inferior articular patellar spurs.
25. Plaintiff again participated in a post-operative physical therapy and rehabilitation program. She was discharged from her therapy program on May 25, 2005.
26. Dr. Murphy testified that in his medical opinion, and the Full Commission finds as fact, that the traumatic injury of August 4, 2003, accelerated the pre-existing arthritis in plaintiff's left knee and contributed to deterioration in her left knee. Dr. Murphy testified that some portion of the need to treat plaintiff's left knee "was brought to the forefront because of the stress put on it in terms of the right knee." He explained the basis for his opinion as follows:
 Getting to know this individual over a certain amount of time, looking at the degree of wear that occurred in her knee over the amount of time that I saw her, seeing a relatively explosive presentation of worsening symptoms without a traumatic event, and seeing that lead to workup including x-rays that now show a pattern of bone on bone in a very short period of time, it is my feeling that based on the subjective and objective information as provided to me . . . there was something that accelerated it faster than I would have expected otherwise.
Dr. Murphy further explained that that there was more force applied, more muscular contracting and more overall external events placed on plaintiff's left knee when she was using her left leg as the primary way of getting around during and after the two surgeries.
27. On September 13, 2005, plaintiff returned to Dr. Murphy, reporting that in July *Page 10 
2005 at a reunion she got up to get food and felt a pop in her right knee with extreme pain and giving way. Since that time, she experienced mechanical symptoms in the right knee and felt the knee was locking up. X-rays showed a possible loose body in the notch. Dr. Murphy injected the right knee with cortisone.
28. On October 18, 2005, Dr. Murphy noted that plaintiff was doing well with her left knee, without much pain and with fairly good function. Her right knee, however, was continuing to be symptomatic following the injury at the reunion in July 2005. Dr. Murphy's impression was continued post-traumatic symptoms right knee, and he recommended arthroscopy.
29. On February 2, 2006, Dr. Murphy performed an arthroscopy on plaintiff's right knee and extensive lysis debridement of adhesions and synovectomy, partial lateral meniscectomy, chondroplasty patellofemoral joint, and extensive removal of spurring at the femoral notch anterolaterally. Dr. Murphy's post-operative diagnoses were post-traumatic grade II and III chondromalacia patellofemoral joint both sides, post-traumatic synovitis and adhesions primarily anterior and anteromedial, torn lateral meniscus with a loose body which was a meniscal fragment, and post-traumatic impinging spurs anterior and anterolateral notch.
30. Dr. Murphy testified and the Full Commission finds that plaintiff was genetically predisposed to degenerative arthritis in her knees. Due to this condition in her knees, plaintiff most likely would have needed knee surgery at some point in time. However, the accident of August 4, 2003 significantly accelerated the degenerative arthritis in plaintiff's knees and the need for surgical intervention in both knees.
31. Dr. Murphy stated and the Full Commission finds that the February 2, 2006 arthroscopic surgery Dr. Murphy performed on plaintiff's right knee was caused and necessitated by a new injury in July 2005 when plaintiff got up from a chair at a reunion and twisted her right *Page 11 
knee, and not by plaintiff's injury at work on August 4, 2003. The torn lateral meniscus that Dr. Murphy discovered and repaired during the surgery on February 2, 2006 was a new and different condition that Dr. Murphy had not seen during the previous two surgeries he performed on plaintiff's right knee. Both the torn lateral meniscus and the post-traumatic synovitis and other conditions that Dr. Murphy discovered during that surgery were caused by the traumatic event at the reunion in July 2005.
32. Dr. Murphy has not assessed plaintiff to be at maximum medical improvement. Although he testified that he would generally assess a permanent impairment about a year after surgery, he had not assessed plaintiff for ratings to either knee.
33. At the time of the completion of the evidence before the Deputy Commissioner, plaintiff had not returned to work. As of February 16, 2006, plaintiff remained completely out of work pursuant to Dr. Murphy's recommendations and opinion. Dr. Murphy testified that at some point plaintiff "could" be able to return to work as an operating room technician, but that he was not sure that she "should." According to his testimony, plaintiff may have the physical capacity to do the work, but it may not be in her best interest, given the demands of the environment. Dr. Murphy's testimony does not clarify to what extent plaintiff's current work status was related to the initial accident of August 4, 2003 or to the July 2005 non-work related injury.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On August 4, 2003, plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with defendant. N.C. Gen. Stat. § 97-2(6). *Page 12 
2. As a consequence of the accident of August 4, 2003, plaintiff suffered injuries to both knees. Plaintiff's left knee condition is compensable because the accident materially accelerated her pre-existing arthritis in both knees, and the injuries to her right knee also materially accelerated her pre-existing left knee condition, by putting more stress on the left knee. Therefore, these conditions are compensable, even though the accident may not have otherwise caused disability to a normal person. N.C. Gen. Stat. § 97-2; Anderson v. MotorCo., 233 N.C. 372, 374, 64 S.E.2d 265, 267 (1951); Cox v. City ofWinston-Salem, 157 N.C. App. 228, 232, 578 S.E.2d 669, 673 (2003);Brown v. Family Dollar Distrib. Ctr., 129 N.C. App. 361, 364,499 S.E.2d 197, 199 (1998).
3. In a claim for additional compensation for medical treatment, the treatment must be "directly related to the original compensable injury."Pittman v. Thomas Howard, 122 N.C. App. 124, 130, 468 S.E.2d 283, 286,disc. review denied, 343 N.C. 513, 471 S.E.2d 18 (1996). It is the burden of the injured worker to prove that the injury or condition being treated is causally related to the compensable injury by accident.Snead v. Mills, Inc., 8 N.C. App. 447, 174 S.E.2d 699 (1970). The North Carolina Court of Appeals stated in Parsons v. Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997) that once the Commission has found a claim compensable, a rebuttable presumption arises that the treatment is directly related to the original compensable injury. The burden then shifts to defendants to prove that the medical treatment is not directly related to the compensable injury. Id.
4. An aggravation of a compensable injury is compensable unless it is the result of an independent, intervening cause attributable to plaintiff's own intentional conduct. Roper v. J.P. Stevens Co.,65 N.C. App. 69, 308 S.E.2d 485 (1983); Starr v. Paper Co.,8 N.C. App. 604, 175 S.E.2d 342 (1970). In Horne v. Universal Leaf TobaccoProcessors, *Page 13 119 N.C. App. 682, 459 S.E.2d 797 (1995), plaintiff was injured in an automobile accident after sustaining a compensable workplace injury. In relating plaintiff's condition after the automobile accident to his original injury, plaintiff's doctor testified that following the automobile accident, plaintiff had a recurrent disc rupture at the same L5-S1 level as plaintiff's first back surgery. The Court appliedHeatherly v. Montgomery Components, Inc., 71 N.C. App. 377,323 S.E.2d 29 (1984) and found that plaintiff's automobile accident was not an independent, intervening cause of plaintiff's continuing disability.
4. In the case at bar, defendant rebutted the Parsons presumption through the expert medical testimony by the only physician who was deposed. Dr. Murphy stated that the torn lateral meniscus in plaintiff's right knee which he repaired on February 2, 2006, was a new and different condition not present after the compensable injury by accident and further that the tear was caused by the traumatic event in July 2005 and did not relate to her original August 4, 2003 injury. Parsons v.Pantry, Inc., supra. In addition there is insufficient expert medical evidence upon which the Commission can conclude that the torn lateral meniscus in her right knee was a natural consequence or aggravation of the compensable injury. Heatherly v. Montgomery Components,Inc., supra.
5. As the result of her compensable accident of August 4, 2003, plaintiff has been unable to return to work earning wages in the same or any other employment and is entitled to payment by defendant of compensation for total disability at the rate of $322.70 per week beginning January 6, 2004 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to payment by defendant of all medical expenses incurred or to be incurred as a result of her compensable injuries to her right and left knees, except for any *Page 14 
examinations or treatment resulting from her July 2005 non-work related injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay plaintiff total disability compensation at the rate of $322.70 per week beginning January 6, 2004 and continuing until further Order of the Commission.
2. Defendant shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury by accident so long as the medical treatment tends to effect a cure or give relief or lessen plaintiff's disability. Plaintiff is specifically entitled to have defendant provide all medical treatment to her right knee and her left knee resulting from her August 4, 2003 injury. Defendant is not responsible for payment of the medical expenses for plaintiff's right knee surgery of February 2, 2006 or the follow-up physical therapy.
3. A reasonable attorney's fee of 25% of the ongoing compensation due plaintiff under this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel. Defendant shall pay every fourth compensation check due plaintiff in the future directly to plaintiff's counsel.
4. Defendant shall pay the costs.
 This 7 day of May, 2007. *Page 15 
 S/__________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING: S/__________________ BUCK LATTIMORE CHAIRMAN
 S/__________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1